No. 29,540.

A. E. HULL, D. D. SHELDON and I. H. COOK, *Appellants*, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, *Appellee.*

(293 Pac. 479.)

Opinion filed December 6, 1930.

*G. W. Sawyer,* of Liberal, for the appellants.

*Luther Burns, J. E. DuMars,* both of Topeka, and *C. C. Wilson,* of Meade, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: Two separate and distinct damage suits brought by different plaintiffs against the Chicago, Rock Island & Pacific Railway Company for loss and injuries sustained in the shipments of horses and mules from Plains, Kan., to St. Louis, Mo., on February 17, 1927, were consolidated and tried together in the district court of Meade county, Kansas, and after separate verdicts were rendered for the plaintiffs by the jury and answers given by the

jury to special questions the court on motion of the defendant railway company rendered judgment for defendant on the answers to the special questions notwithstanding the general verdicts, and the plaintiffs have appealed.

Appellants do not attack the answers to the special questions. They insist they are supported by the evidence and are consistent with the general verdicts, and that the trial court erred when it in effect set aside the general verdicts.

Of course, the appellee cannot attack the answers, having moved for judgment on them in its favor notwithstanding the general verdict. (*Commerce Trust Co. v. Pioneer Cattle Loan Co.*, 120 Kan. 712, 244 Pac. 840.)

So the main question presented by the appeal is whether or not the answers are inconsistent with the general verdict. For such purpose alone we do not need the evidence. The determination as to the answers being consistent or inconsistent with the general verdict is generally reached by the usual rules of construction, viewing them in the light of the allegations and admissions in the pleadings and the instructions of the court in the submission of the matters to the jury.

We do not have the benefit of the instructions in the record on this appeal, so we must depend more largely upon the pleadings. The general verdict for the plaintiffs Sheldon and Hull was in the sum of $442.38. That for the plaintiffs Cook and Hull was in the sum of $171.19.

The answers to the special questions applied to both cases and are as follows:

"1. Do you find a storm came suddenly the afternoon of February 17, 1927, accompanied by a high wind and some sleet and snow, drifting snow with some dust or sand into cuts along defendant's railway from Liberal to Pratt or a portion thereof, so that trains could not be safely operated? A. No.

"2. Do you find that before trains could be safely operated between Liberal and Pratt, and through the town of Plains, it was necessary to open the line with a snow plow or plows? A. Yes.

"3. Do you find that the railroad could be effectively opened by the use of a snow plow during the prevalence of the storm of February 17, 1927? A. No.

"4. If you find certain of plaintiff's animals were injured, do you find from the evidence what caused such injury? A. Yes.

"5. If you find certain of plaintiff's animals were injured, then state at what point or points they were injured. A. Plains, Kan.

"6. Do you find from the evidence that defendant railway company was guilty of negligence in handling plaintiff's animals? A. Yes.

"7. If you answer question No. 6 in the affirmative, then state whereof and wherein such negligence consisted. A. Through negligence of Chicago, Rock Island & Pacific Railway Co. to properly take care of stock and transport them."

The trial court held that the answer to question No. 1 was contrary to the answers to question Nos. 2 and 3, and also that the last three words of the answer to question No. 7 should be stricken and disregarded, because of not being supported by the evidence.

The case brought by Sheldon and Hull concerns the shipment of forty-five head of horses and mules loaded and shipped in two cars. The other case brought by Cook and Hull concerns the shipment of twenty-three head of horses loaded and shipped in one car. They were all loaded February 17, 1927, freight paid, and bills of lading or shipper's agreements issued and delivered by the agent of the defendant railway company at Plains, Kan., to the plaintiffs, consigning them to the horse and mule market at St. Louis, Mo.

The following four paragraphs of one of the petitions are necessary to be considered:

"Plaintiffs further allege that the said live stock was delivered to the said defendant in good condition; that said shipments were never transported and delivered in as good condition as when received by the defendant railway company; that transportation thereof was delayed; that the live stock was transferred en route a number of times by said defendant, its agents, employees and connecting carriers, and the stock was permitted to suffer for want of care, proper handling and transporting; that it was subjected to hazards, neglect and delay in transportation, and was carelessly handled and transported, and the stock was so jerked, jostled, jammed, bruised and wounded, and exposed to the weather and elements by reason of the negligence of the defendant and its failure to provide proper protection and care, that the handling and transportation in said manner caused said live stock to shrink in weight, to become maimed, bruised, injured and wounded, and to depreciate in value, and to make the stock unsalable on the market by reason of their condition; and causing plaintiffs to be charged extra expense for feed en route, and to suffer decline in market by reason of the delay and the refusal to properly transport said live stock, and the delays and expense incurred in transferring said stock from one car to another, and in the loss of time and expense of the plaintiffs in making said shipment, and a depreciation in the market value of all of said live stock, due to such neglect and the consequential injuries, shrinkage and damage, to the decline in market, and the difference in value of the animals as injured, and damaged, after being delivered to said railway company—all of which was the proximate result of the delays, failure and neglect of the defendant railway company to properly care for, handle, transport and deliver said live stock in as good condition as when received.

"Plaintiffs further state that by reason of the delays and refusal of said defendant company to promptly transport and deliver said live stock in the condition as originally received and billed in cars R. I. No. 73283 and R. I. No. 500068, and the injury, depreciation, shrinkage, damage and decline in market price, and the depreciation in value of said live stock as a result and consequence of such neglect, failure and delay, all of which damage, loss and injury was the proximate result of such neglect, failure and delays of the defendant railway company, plaintiffs were caused to suffer irreparable loss and damage to said shipment.

"That one horse was injured in some manner unknown to the plaintiff after it was loaded and billed with others in one of the cars, and become weakened, got down, and was bruised, skinned and so injured and neglected that it became necessary to take it out of the car by the defendant company in which it was loaded, before said shipment was moved, and the said animal died; that five others were severely and seriously injured, and were bruised, skinned and swollen, some had their eyes skinned and heads badly skinned, legs injured, bruised and skinned, knees bruised and swollen, legs swollen and crippled, and the remaining sixteen in one of the cars were so bruised and injured in a lesser but similar manner that it caused them to suffer and become gaunt, and thereby decline in weight and appearance, and become unfit for the market.

"That by reason thereof, plaintiffs were caused to suffer loss and damage on said property, for which the defendant is liable as hereinbefore alleged, in the following sums, and for the following items, to wit:

"$75.00 for the value of one horse killed;

"$180.00 for the detriments suffered, and the depreciation in values of five animals;

"$70.00 for the detriments suffered, and the shrinkage and depreciation in value of the fifteen animals;

"$38.58 for the proportional amount of the freight paid on the one dead animal loss to plaintiffs, and the five injured animals, all of which animals were loaded in one of said cars."

The petition then enumerates the injuries sustained by the animals in the other car, as was done in one of the paragraphs above, and the total loss as enumerated above, except there was no animal killed in the second and the losses alleged in the corresponding classification, as above, with the omission of the first item where the horse was noted as killed, are: $160, $90 and $45, and when combined in the prayer with the losses enumerated as sustained in the first car, the totals are $575, with $22 feed bills and $83.58 for proportionate amount of freight.

The allegations of the petition in the other case are exactly the same except as to extent and description of injuries received, and except that there were no animals killed, and the total amount of damages claimed is $250, together with $5.50 for feed bill and $30.35 for proportionate amount of freight charged.

The answer admitted the shipment and attached thereto a copy of the bill of lading or uniform live-stock contract, of which two sections are as follows:

" 'Section 1. (a) Except in the case of its negligence proximately contributing thereto, no carrier or party in possession of all or any of the live stock herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, quarantine, the authority of law, the inherent vice, weakness, or natural propensity of the animal, or the act or default of the shipper or owner, or the agent of either, or by riots, strikes, stoppage of labor or threatened violence.

" '(b) Unless caused by the negligence of the carrier or its employees, no carrier shall be liable for or on account of any injury or death sustained by said live stock occasioned by any of the following causes: Overloading, crowding one upon another, escaping from cars, pens or vessels, kicking or goring or otherwise injuring themselves or each other, suffocation, fright, or fire caused by the shipper or the shipper's agent, heat or cold, changes in weather or delay caused by stress of weather or damage to or obstruction of track or other causes beyond the carrier's control.' "

The following additional paragraphs of the answer are pertinent:

"Defendant avers that at or about the time said live stock was being loaded a storm of great intensity reached Plains, Kan., accompanied by an exceedingly high wind, with rain, which turned to sleet and later to snow, and that a snow storm of great severity prevailed over the entire southwestern part of Kansas, drifting badly into highways and upon the right of way and into cuts upon the line of defendant's railway, and that such snowfall and the blowing and drifting thereof into the railway cuts and upon defendant's railway became and was so extensive that it thereupon became impossible to operate defendant's trains upon its railroad in the southwestern part of the state of Kansas, including its lines east and west of the town of Plains. That it became impossible through the exercise of the greatest care and caution to operate defendant's passenger and freight trains, and its said passenger and freight trains were delayed and stalled by reason of said storm. That defendant used and exercised every means known to modern railroad customs and practices to keep its said line of railroad open for traffic and for the handling of its passenger and freight trains. That notwithstanding all of such efforts it became and was impossible to so operate such trains. That the condition then existing and prevailing was entirely beyond the power and control of this defendant or of any human agency, but such conditions existed and prevailed by virtue of a power known and designated in law as the act of God.

"Plaintiffs were advised of the facts hereinbefore alleged and of the impossibility of operating trains because of said conditions, and were given an opportunity to unload said animals from said cars and place them in barns or sheds until such time as defendant could transport them after the storm abated. That plaintiffs expressed the desire and permitted said live stock to remain aboard cars, and defendant avers that if the said animals were injured

that such injury was caused by the inherent vice, weakness and natural propensity of the animals and by the act and default of plaintiffs herein in failing to take charge of said animals after having been advised of the impossibility to operate trains."

The following paragraphs of the reply are important:

"Plaintiffs allege that the said live stock at the time it was received by the defendant railway company at Plains, Kan., and loaded in said car, was in good healthy condition, the animals having been placed in good physical condition for market, and were uninjured at the time of the delivery to said defendant railway company, at Plains, Kan., and were in excellent condition for shipment and market; and by reason of the delay of the defendant railway company in transporting said live stock, the said two cars of loaded live stock were not transported and cared for by the defendant railway company to the market within the time they should have been moved and transported; and by reason of the carelessness and negligence of the defendant railway company in operating its freight trains, the said two cars of live stock were not removed and transported to the market for the plaintiffs as the defendant railway company agreed to do.

"Plaintiffs further allege that the defendant railway company did not advise the plaintiffs of the facts and conditions relative to said alleged storm until after the defendant railway company had failed, neglected and refused to transport said live stock on the occasions as its agents, servants and employees promised to do; and the opportunity given the plaintiffs to unload said animals from said cars was not given to the plaintiffs by the defendant railway company, its agents, servants and employees until hours after they were loaded and received, and the alleged storm was at its height, and the plaintiffs, relying upon the promises and obligations of the defendant railway company, its agents, servants and employees, assumed said shipments had long been en route to market ahead of the alleged storm."

It will be readily recognized, from the portion of the pleadings above quoted, that the main issue in these cases was on the defense of release from liability on account of a storm, the act of God, which was not only pleaded by the defendant company, but the shipper's agreement or bill of lading was made a part of the answer, which set out in two separate paragraphs these releases from liability. In other words, with a specific agreement of this kind excusing the railroad company, unless caused by its own negligence, from all liability for or on account of an injury to or death sustained by live stock on account of heat or cold, change in weather or obstruction of track beyond the carrier's control, is anything further necessary to constitute a complete defense to such action than the existence of such a storm or track obstruction? Is the exception of liability in the shipper's agreement to be disregarded or ignored?

It is true that a loss or injury of some kind could possibly have occurred during the prevalence of a storm that obstructed the track which had no connection with the storm or the forced delay in shipment. This very possibility gives force and effect to the qualifying provision, "unless caused by the negligence of the company." No such distinct or separate act or omission of negligence is alleged in the reply where plaintiffs refer to the allegations of the defendant as to the storm. The reply only complains of the delay of the defendant and its agents in giving the plaintiffs advice as to the facts and conditions relative to the storm and an opportunity to unload the live stock, evidently having in mind the information about the delay of an expected freight train and the resumption of traffic. Both of these references have to do with the storm. It is also possible that a company may be distinctly negligent entirely aside from the storm, where it unnecessarily and unreasonably delays a shipment after the storm is over and the track is cleared, and the injury complained of was due to such unnecessary delay as the proximate cause. With this possibility in mind, more of the petition and reply have been purposely set out herein than would ordinarily have been done, but from which we are convinced that no such separate and distinct loss or damage is included therein nor actually intended thereby. The force of the reply is to the effect that the storm pleaded by the defendant was of little or no consequence, and the original allegations of negligence were reiterated.

The pleadings distinctly raise the issue of a storm as a defense to the entire claim of the plaintiffs and for the entire negligence charged in the petition. The jury found in the second finding that before trains could safely operate it was necessary to open the line with a snow plow, and in the third finding that the snow plows could not be effectively operated during the storm.

We conclude that a storm under the contract was a complete defense to the claim of the plaintiff as alleged and that the answers fully establish the existence of such a storm as was covered and intended by the provisions of the contract.

Appellants urge the rule that judgment on the special findings, notwithstanding the general verdict, should not be sustained unless the special findings are so out of harmony with the general verdict that the latter cannot stand, as was announced in *Smith v. Tri-County Light & Power Co.*, 120 Kan. 123, 241 Pac. 1090, and other

cases, and we are observant of that rule when we find it impossible to harmonize the definite finding of the fact of the existence of a snow storm obstructing the track, with the general verdict which shows negligence on the part of the defendant, from which it was by contract excused in case of storm. No suggestion is made as to how the definite finding as to the storm and obstruction can be ignored or disregarded. Appellants cite the case of. *Springer v. Railroad Co.,* 95 Kan. 408, 148 Pac. 611, where an answer showing negligence in one particular only does not preclude another form of negligence already found. This would be applicable if the exemption from liability under the terms of the contract was ·limited to certain acts of negligence only. But there is no such limitation in this sweeping exemption in the contract. The same rule applies to storms as to floods, both being acts of God.

"An agreement by a railroad company with a shipper to transport his goods from one station to another on its railroad within a certain time does not make the carrier an absolute insurer of the goods. Their destruction within the prescribed time by an act of God will excuse nondelivery thereof." (*Sauter v. Railway Co.,* 78 Kan. 331, syl. ¶ 2, 97 Pac. 434.)

"The negligent delay of a carrier in moving goods intrusted to it for transportation, not so unreasonable as to amount to a conversion, will not render it liable for the loss of such goods after they have been carried to their destination if they are there destroyed by an act of God before delivery." (*Rodgers v. Railway Co.,* 75 Kan. 222, syl., 88 Pac. 885.)

The first question answered by the jury. was a compound one consisting of several distinct parts to which there might possibly have been entirely different answers. It also contained a few adjectives and qualifying terms so that the answer to it became more like a conclusion than a finding of a fact, and in such a case it should be controlled by the other findings of fact. (*Railway Co. v. Laughlin,* 74 Kan. 567, 87 Pac. 749.)

The last finding stated that in which the negligence consisted, and was in two parts—neglect to properly care for the stock, and transport them. The first part is more in the nature of an omission of duty, one form of negligence, than an act of negligence, and is not out of harmony with the findings concerning the storm. The last part of the answer, while it might refer to negligence on the trip to St. Louis and not at Plains, yet it might very properly apply to the neglect or failure to move the cars out of Plains; that is, the neglect or failure to transport them.

We conclude that the special answers are inconsistent with the general verdict, and find no error in the ruling of the trial court in rendering judgment on the answers for the defendant notwithstanding the general verdict.

The judgment is affirmed.